UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| UNITED STATES OF AMERICA and CALIFORNIA DEPARTMENT OF TOXIC SUBSTANCES CONTROL,<br><br>    Plaintiffs,<br><br>    v.<br><br>NEWMONT CAPITAL LIMITED, and NEWMONT MINING CORPORATION OF CANADA LIMITED,<br><br>    Defendants. | No. 2:08-cv-02149-MCE-JFM<br><br><br><br><br>MEMORANDUM AND ORDER |

Presently before the Court is Plaintiffs' unopposed Motion for Judgment to Enter Consent Decree. Because the Court finds the terms of the Consent Decree fair, reasonable, and consistent with the purposes that the Comprehensive Environmental Response Compensation and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., is intended to serve, Plaintiffs' Motion is granted.[1]

---

[1] Because oral argument will not be of material assistance, the Court ordered this matter submitted on the briefing. E.D. Cal. Local Rule 78-230(h).

1

**PROCEDURAL BACKGROUND**

On September 12, 2008, pursuant to 42 U.S.C. § 9622(d), the United States, on behalf of the Environmental Protection Agency ("EPA") and the California Department of Toxic Substances Control ("DTSC") (collectively "Plaintiffs") lodged a Consent Decree with this Court resolving their claims against Newmont Capital Limited ("Newmont Capital") and Newmont Mining Corporation of Canada Limited ("Newmont Mining") (collectively "Defendants").

As required by law, notice of the proposed settlement was also published in the Federal Register, inviting public comment. One comment was received before the comment period expired on October 20, 2008. However, that response did not address whether the Consent Decree was fair, reasonable, or consistent with the goals of CERCLA, and instead made only generalized allegations against Defendants.

Accordingly, Plaintiffs now move for entry of the Consent Decree, under which Defendants agree to reimburse Plaintiffs for a portion of clean-up costs incurred at the Lava Mine Superfund Site ("the Site"). Specifically, settling Defendants agree to pay to Plaintiffs three million dollars, $1,860,000 to the United States and $1,140,000 to DTSC. Applicable interest began accruing on July 2, 2008, and will continue to do so through the date of payment.

///
///
///
///

**FACTUAL BACKGROUND**

The Site is located approximately five miles southeast of Nevada City, California, and includes portions of Little Clipper Creek drainage, Clipper Creek drainage, Little Greenhorn Creek, Lost Lake, and the underlying groundwater. Both the Lava Cap Mine and the Banner Mine are located on the Site.

Gold and silver mining began at the Lava Cap Mine in 1860 and at the Banner Mine in 1861, though, from 1860 to 1934, neither mine was utilized for large scale operations. However, in 1932, the Lava Cap Gold Mining Corporation ("LCGMC") bought both mines and subsequently constructed an ore processing plant. Thereafter, from 1934 until it ceased operations in 1943, the Lava Cap Mine became one of the largest gold mines operating in California.

The extensive mining operations created a large pile of mill tailings at the Site.[2] Despite efforts to contain those mill tailings, arsenic contaminated water was released from the Lava Cap Mine into, *inter alia*, Little Clipper Creek.

From 1934 to 1983, ownership of the mines transferred to various corporations under whose control arsenic-contaminated water and tailings continued to be released into the environment. Eventually, in 1979, a log dam partially collapsed, releasing a sudden and significant discharge of tailings into Little Clipper Creek.

---

[2] Mill tailings are extremely fine-grained materials containing high concentrations of arsenic. Not only are mill tailings extremely toxic, they are easily suspended in water and therefore susceptible to being carried offsite.

3

On July 11, 1983, Franco-Nevada Mining Corporation Limited ("FNMCL") entered into an agreement to purchase the Lava Cap Mine and the Banner Mine. On December 31, 1983, Keystone Copper Corporation ("Keystone") conveyed title to both mines to Franco-Nevada Mining Corporation, Inc. ("FNMCI"). At some point, FNMCL became Newmont Mining and FNMCI became Newmont Capital. Newmont Capital did not conduct any active mining at the Site, and, by December 23, 1986, conveyed both mines back to Keystone.

On or about January 1, 1997, the upper half of the aforementioned log dam completely collapsed, discharging over 10,000 cubic yards of mill tailings into Little Clipper Creek. That discharge prompted investigations by several local and national agencies. The EPA eventually determined that the conditions at the Site met the National Contingency Plan criteria set forth in 40 C.F.R. Part 300.415(b)(2) for removal action, and on January 19, 1999, listed the Site on the National Priorities List ("NPL").

Through April 30, 2008, the EPA had incurred $21,365,002.14 in response costs for the Site, and anticipates incurring additional response costs as well. Through March 31, 2008, DTSC had incurred $717,143.16 in response costs and likewise anticipates continuing to incur additional costs. The EPA estimates total Site costs will reach approximately $50 million.[3]

///
///
///

---

[3] Total Site costs include both past and future cleanup costs as well as costs of operation and maintenance.

4

**STANDARD**

"In CERCLA, Congress created a framework for the United States and the states to respond to releases and threatened releases of hazardous substances into the environment. Under section 104(b) of CERCLA, 42 U.S.C. § 9604(b), the United States is authorized to investigate such releases or threatened releases of hazardous substances, and to respond to those releases in order to protect public health and the environment." U.S. v. Cannons Eng'g Corp., 720 F. Supp. 1027, 1031 (D. Mass. 1989) ("Cannons I").

Additionally, pursuant to 42 U.S.C. § 9607(a), the United States and the States are permitted to sue to recover subsequent response costs. Id. CERCLA also logically authorizes the United States to enter into consent decrees, which provide for the reimbursement of those response costs and the settlement of future claims, with potentially responsible parties ("PRPs"). 42 U.S.C. § 9622.

Indeed, it is the policy of CERCLA to encourage early settlements. U.S. v. Montrose, 50 F.3d 741, 746 (9th Cir. 1995). "That policy has particular force where, as here, a government actor committed to the protection of the public interest has pulled the laboring oar in constructing the proposed settlement." U.S. v. Cannons Eng'g Corp., 899 F.2d 79, 84 (1st Cir. 1990) ("Cannons II").

///
///
///

"Although 'the true measure of the deference due depends on the persuasive power of the agency's proposal and rationale,' a district court reviewing a proposed consent decree 'must refrain from second-guessing the Executive Branch.'" Montrose, 50 F.3d at 746, quoting Cannons II, 899 F.2d at 84.

Such deference is appropriate in a situation such as this, "given '[t]hat...[the] affected parties, themselves knowledgeable and represented by experienced lawyers, have hammered out an agreement at arm's length and advocate its embodiment in judicial decree.'" Id., quoting Cannons II, 899 F. 2d at 84. "The relevant standard, after all, is not whether the settlement is one which the court itself might have fashioned, or considers as ideal, but whether the proposed decree is fair, reasonable, and faithful to the objectives of the governing statute." Cannons II, 899 F.2d at 84.

**ANALYSIS**

**A.   The Consent Decree is Fair**

Whether a settlement is fair is a two-part inquiry, requiring the Court to look at both procedural and substantive fairness. Cannons II, 899 F.2d at 86. "To measure procedural fairness, a court should ordinarily look to the negotiation process and attempt to gauge its candor, openness, and bargaining balance." Id. The related inquiry into substantive fairness requires the Court to determine whether the Consent Decree apportions liability based on how much harm each PRP has done. Id. at 87.

6

1      Here, the Consent Decree is the result of extensive
2 negotiations between the parties, one of which is the United
3 States' Government.  The negotiations were conducted at arms
4 length, and both sides were represented by counsel.  Furthermore,
5 there is every indication that the government conducted its
6 negotiations in good faith.  Therefore, the settlement set forth
7 in the Consent Decree is procedurally fair.
8      Moreover, the Consent Decree is substantively fair because
9 the parties allocated Defendants' liability in proportion to
10 their level of culpability for the harm done at the Site.
11 Notably, the exact choice of formula utilized in determining that
12 proper allocation should be left to the EPA's expertise and
13 "upheld so long as the agency supplies a plausible explanation
14 for it, welding some reasonable linkage between the factors it
15 includes in its formula...and the proportionate shares of the
16 settling PRPs."  Id.
17      In this case, the parties employed a formula incorporating
18 length of ownership of the Site, Defendants' activities during
19 ownership, and potential litigation risks.  Indeed, Defendants
20 owned the mines for only three years, during which time they
21 conducted no active mining operations and limited their
22 activities to legal and administrative planning.  Incorporating
23 those facts, the parties reached the proposed three million
24 dollar settlement, assigning Defendants 4% of the total past and
25 projected future site costs.  Based on the relative certainty of
26 anticipated costs, the EPA then applied either a 50% or 100%
27 premium to specific clean-up projections.
28 ///

Additionally, according to Plaintiffs, the recovery provided for in the instant agreement equals or exceeds that which they would anticipate to reach through protracted litigation.

In sum, the parties incorporated both the short duration of Defendants' ownership and their relatively limited use of the Site into this proposed settlement and then proportionately allocated the costs to be paid by Defendants to Defendants' relative level of culpability.  Thus, this Court finds the Consent Decree to be substantively fair, and, consequently, the agreement withstands scrutiny under the first prong of this three-part analysis.

### B. The Consent Decree is Reasonable

The Court next must evaluate whether this Consent Decree is reasonable. "[E]valuation of a consent decree's reasonableness will be a multifaceted exercise." Cannons II, 899 F.2d at 89. Relevant to the inquiry is whether the decree is likely to cleanse the environment, whether it adequately compensates the public for the response costs, and whether it takes into proper account the strength of the parties' relative litigating positions. Id. at 90.

First, costs recovered from Defendants by the EPA will be retained in a Lava Cap Mine Special Account and used to finance further cleanup actions at the Site.  Additionally, Plaintiffs allegedly intend to continue facilitating current remedial measures such that the recovery of funds under this Consent Decree is likely to properly contribute to cleansing the environment.

8

1  Finally, the Court finds that, based on its above fairness
2  discussion, the settlement amount properly reimburses the public
3  for Defendants' limited involvement at the Site and accurately
4  reflects the parties positions relative to one another in this
5  litigation.
6       Accordingly, because the Consent Decree will further the
7  congressional goal of cleansing the environment and because, when
8  balanced against the risks associated with protracted litigation,
9  the settlement adequately compensates the public for Defendants'
10 involvement, the Court finds this Consent Decree to be
11 reasonable.

### C. The Consent Decree is Consistent With the Purposes CERCLA is Intended to Serve

15      Finally, the Court must evaluate whether this Consent Decree
16 is consistent with the purposes CERCLA is intended to serve.  "Of
17 necessity, consideration of the extent to which consent decrees
18 are consistent with Congress' discerned intent involves matters
19 implicating fairness and reasonableness.  The three broad
20 approval criteria were not meant to be mutually exclusive and
21 cannot be viewed in majestic isolation."  Cannons II, 899 F.2d at
22 90.  Consequently, the above discussion will necessarily inform
23 the following inquiry.
24 ///
25 ///
26 ///
27 ///
28 ///

1    In turning to the final criterion, the Court must evaluate
2 the Consent Decree in the context of two policy concerns: "First,
3 Congress intended that the federal government be immediately
4 given the tools necessary for a prompt and effective response to
5 the problems of national magnitude resulting from hazardous waste
6 disposal.  Second, Congress intended that those responsible for
7 problems caused by the disposal of chemical poisons bear the
8 costs and responsibility for remedying the harmful conditions
9 they created."  Id. at 90-91.  Thus, "[i]t is crystal clear that
10 the broad settlement authority conferred upon the EPA must be
11 exercised with deference to the statute's overarching principles:
12 accountability, the desirability of an unsullied environment, and
13 the promptness of the response activities."  Id. at 91.
14    Those principles are satisfied here.  This settlement fairly
15 and reasonably reimburses Plaintiffs' for those response costs
16 already incurred and provides for future clean up costs in
17 proportion to Defendants' culpability.  Additionally, the Consent
18 Decree holds Defendants legally and financially accountable for
19 those environmental injuries sustained by Plaintiffs during the
20 period of Defendants' Site ownership.  Moreover, resolution of
21 the current dispute frees Plaintiffs to turn their attention to
22 pursuing the recovery of costs from remaining PRPs, which will
23 ultimately further the Congressional intent underlying CERCLA.
24 Accordingly, the parties' instant agreement is consistent with
25 the underlying objectives of CERCLA and is approved.
26 ///
27 ///
28 ///

10

**CONCLUSION**

Accordingly, the Motion for Judgment to Enter Consent Decree as final judgment in this matter is GRANTED.

IT IS SO ORDERED.

Dated: February 20, 2009

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE

11